## UNITED STATES DISTRICT COURT
## WESTERN TEXAS DISTRICT
## MIDLAND/ODESSA DIVISION

| | | |
|---|---|---|
| PATRICIA HOLCOMB, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No.  7:20-cv-66 |
| | § | |
| WAL-MART STORES, INC., | § | |
| | § | |
| Defendant. | § | |

## ORIGINAL COMPLAINT

**COMES NOW** Patricia Holcomb ("Plaintiff"), by and through her legal counsel, and for her complaint against the Defendant Wal-Mart Stores, Inc., states as follows:

## PARTIES

1.      Defendant Wal-Mart Stores, Inc., ("Wal-Mart" or "Defendant") is a Delaware corporation authorized to do and doing business in Texas, with retail stores throughout the state. Its corporate headquarters is located in Bentonville, Arkansas.  Wal-Mart Stores, Inc. operates retail stores doing business as Wal-Mart Discount Stores, Wal-Mart Supercenters, Wal-Mart Neighborhood Markets and Sam's Clubs Stores (collectively "Wal-Mart") in Texas. Wal-Mart was/is also the employer of Plaintiff at all times relevant during the period giving rise to the subject liability set forth hereinbelow.

2.      Plaintiff Holcomb is a resident of Abilene, Texas and at all times relevant herein was employed by Defendant Wal-Mart Stores, Inc. for approximately eighteen (18) years from 1986-2004. Plaintiff Holcomb was employed at Wal-Mart Store #966 located in Cortez, Colorado from 1986-1989, Wal-Mart Store #1058 located in Montrose, Colorado from 1989 through July

2001, Wal-Mart Store #819 located in Coral Gables, Florida from July 2001 through November 2001, a Wal-Mart Store located in Midland, Texas from December 2001-January 2001, Wal-Mart Store #537 located in Odessa, Texas from February 2001 through July 2003, and Wal-Mart Store #533 in Abilene, Texas from July 2003 through May 2004.

## JURISDICTION AND VENUE

3.      Plaintiff's claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*.  This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. §§ 1331, 1343(a)(4).

4.      Venue is proper in this District pursuant to 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1391(b) & (c).  Plaintiff's claims arose primarily in Texas and give rise to the claims herein-alleged.

## NATURE OF THE CASE

5.      Plaintiff is a former employee of Defendant Wal-Mart Stores, Inc. Plaintiff alleges that Wal-Mart illegally discriminated against her on the basis of her gender by paying her less than similarly-qualified or less-qualified male employees and/or by promoting her less quickly and less frequently than similarly-qualified or less-qualified male employees.

6.      Plaintiff alleges that Wal-Mart discriminated against her based on her gender and/or that Wal-Mart's compensation and promotion policies and practices have had a disparate impact not justified by business necessity upon all of its female employees, including Plaintiff.

7.      Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e, *et seq*., against Wal-Mart for its discriminatory practices against her based on her gender, as set forth herein.

## BACKGROUND – CASE HISTORY AND EXHAUSTION OF REMEDIES

8.       This action springs from *Dukes v. Wal-Mart*, 564 U.S. 338 (2011), the national class action filed more than ten years ago.  In *Dukes*, the United States District Court for the Northern District of California certified a national class of female Wal-Mart (and Sam's Club, a division of Wal-Mart) employees challenging Wal-Mart's retail store pay and management promotion policies as being discriminatory against women.  On June 20, 2011, the United States Supreme Court reversed that class certification order.

9.       Plaintiff was a member of the national class certified in *Dukes*.   While that certification order was working its way through the appellate process, time periods for filing EEOC charges and subsequent litigation for all former class members were tolled.

10.      Following the Supreme Court's decision in *Dukes*, the United States District Court for the Northern District of California subsequently held that claims of class members would be tolled during the pendency of the national class action until the following dates: (1) former class members who had received a Notice of Right to Sue from the EEOC based on a claim encompassed by the former class definition would have until October 28, 2011, to file suit; (2) all other former class members in *non-deferral* states would have until January 27, 2012, to file a charge of discrimination with the EEOC based on conduct encompassed by the former class definition; and (3) all other former class members in *deferral* states would have until May 25, 2012, to file a charge of discrimination with the EEOC based on conduct encompassed by the former class definition.  (*See* Judge Breyer's Order of August 19, 2011).

11.      Plaintiff timely filed a charge of discrimination with the EEOC pursuant to the deadline set by the United States District Court for the Northern District of California's August 19, 2011, Order.

12.     Plaintiff received a Notice of Right-to-Sue from the EEOC and this Complaint is being timely filed within 90 days of the receipt of such notice.

13.     Plaintiff has therefore exhausted her administrative remedies and complied with the statutory prerequisites of Title VII by timely filing EEOC Charges of Discrimination.

14.     The relevant time period in this action for Plaintiff's claims is based on the limitations period from *Dukes*.  The limitations period starts on December 26, 1998, which is 300 days before the earliest charge filed with the EEOC by a former member of the *Dukes* class, and runs through the date of trial.

## FACTUAL ALLEGATIONS
### Organizational Structure and Hierarchy

15.     In the time period relevant to this lawsuit, Wal-Mart's retail operations were divided geographically into six Wal-Mart divisions, each consisting of approximately six regions. Regions 9, 44, and 20 and Sam's Club 2 are largely based in Texas.

16.     Each store in Regions 9, 44, and 20 and Sam's Club 2 had the same job categories, job descriptions and management hierarchy.  At the bottom of the ladder, the primary entry-level hourly positions were Cashier, Sales Associate and Stocker.

17.     The first step above an entry-level job was an hourly supervisor position, including Department Manager and Support Manager.  The next step up was Management Trainee ("MIT"), a four-to-five-month program that prepared employees to be Assistant Managers, a salaried position.  Each store had several Assistant Managers.  The next level was Co-Manager, a position used only in larger stores, and the top level was Store Manager.

18.     From 1998-2004, Store Managers set pay for hourly employees following Wal-Mart's guidelines governing compensation.  Each Store Manager reported to their District Manager, and in order to maintain a consistent administration of the pay guidelines, certain hourly

pay decisions were reviewed by the District Manager for approval.  Specifically, exceptions to the pay guidelines, as well as some actions within the Guidelines (such as setting starting pay more than 6% above the minimum rate, *see infra* at [SEE SECTION BELOW RE: HOURLY PAY]) were reviewed by the District Manager, who had to decide whether or not to approve the Store Manager's pay decision.  Thus, the Store Managers received regular feedback from the District Managers about their decision-making.

19.     District Managers reported to the Regional Vice President ("RVP").  In addition to the formal feedback from District Managers to Store Managers through the hourly pay exception process, both the RVP and District Managers spent a large amount of time touring stores and talking with the Store Managers in those stores.  Similarly, the RVP held regular in-person meetings and conference calls with all of the District Managers.  These regular meetings touched on many aspects of store operations, including "people issues."  Thus, there was a constant stream of communications with district and regional management that provided feedback to Store Managers about their hourly compensation decisions and guidance about how Wal-Mart regional management expected them to carry out their pay and promotion responsibilities.

20.     The RVP also had overall responsibility for pay increases for Assistant Managers and had influence over promotions into MIT positions.

21.     Regions 9, 20, and 44 and Sam's Club 2 also each had a Regional Personnel Manager ("RPM"), who was responsible for promotion into the MIT program and starting pay for MIT and Assistant Managers.

**PAY DISCRIMINATION**

22.     *Common Compensation Policies* — Wal-Mart has set compensation of store-based employees using a common set of guidelines, which Wal-Mart's managers have applied consistently throughout the store(s) where Plaintiff has worked.  The pay guidelines established basic standards for setting pay rates at hire and subsequent pay adjustments for hourly and salaried employees.

**Hourly Pay**

23.     *1998-2004 Hourly Pay Structure* — From 1998 through June 2004, Wal-Mart assigned jobs to five classes, the top two of which were only used for a few specialty jobs.  Jobs were assigned to the same class regardless of department.  Each successive job class had a higher minimum starting pay rate.

24.     The minimum pay levels at hire ("start rates") for each job category were established for the store(s) where Plaintiff has worked with the approval of the applicable District Managers and RVP.  Thereafter, an employee's pay level could be adjusted: (1) after an initial probationary period; (2) if the employee was promoted to a higher job class or into management; (3) on an annual basis, if the employee satisfied minimum performance standards; or (4) if the employee had been awarded a special "merit" raise.

25.     The Store Manager had the initial responsibility to set pay rates for individual hourly employees within the pay guidelines, subject to constraints set by the District Manager and RVP.  Where a Store Manager set a pay rate above or below the pay guidelines, the rate was called an "exception."

26.     The pay rate for a new employee could be set up to a maximum of $2 per hour above the start rate, but if the new employee's rate was more than 6% above the established start

rate for that pay class, a computer program in the payroll system would prohibit payment at this rate unless and until the Store Manager manually entered the pay rate for that employee.

27.     All hourly pay exceptions were automatically reported to the District Manager, who could approve or disapprove such exceptions.  The RPM was also informed of all hourly pay exceptions and was required to ensure that hourly compensation was consistent among employees in the Region.

28.     In the store(s) where Plaintiff worked, District Managers, the RPM, and the RVP regularly received reports of all employees whose hourly pay in a job category is/was more than 10% below or 5% above the average pay in that category.  District Managers performed quarterly audits of each store's compliance with company policies and Region-specific policies, including compensation policies, which were then reported to the RPM and RVP.

29.     District Managers and the RVP had ultimate authority over whether, and by how much, to adjust the pay of hourly employees, including those employees listed on exception reports.

30.     In the store(s) where Plaintiff has worked, managers were not required to use job-related criteria, such as job performance or experience, in setting, adjusting or approving compensation for individual employees.  Managers did not document the reason(s) for setting, adjusting or approving the compensation of individual employees. The RVP and District Managers did not hold the Store Managers in the store(s) where Plaintiffs worked accountable for the factors the Store Managers used in making pay decisions or in ensuring that those factors comported with the law and did not discriminate against women, nor did they require any documentation of the reasons for the compensation paid to individual employees.  Nor did Wal-Mart managers specify the weight to be accorded any particular requirement in setting or adjusting compensation.

31. *Patterns in Compensation* — Women who held hourly positions in the store(s) where Plaintiff worked have been regularly paid less than similarly-situated men; although, on average, those women have more seniority and higher performance ratings than their male counterparts. This gender pay difference adverse to women exists in each of the store(s) where Plaintiffs have worked, even when nondiscriminatory objective factors, such as seniority, performance, store location and other factors are taken into account.

32. *Adverse Impact of Hourly Compensation Policies* — Wal-Mart's compensation policies, including its policy of using a set of prescribed factors to set starting pay for hourly associates at a pay rate above the minimum rate, as well as its policy of setting pay adjustments based on the associate's prior pay, have had an adverse impact upon its female employees in the store(s) where Plaintiff has worked, to include specifically upon Plaintiff.

33. The RPM, RVP and District Managers have received, and continue to receive, regular reports about compensation for hourly and salaried employees within the store(s) where Plaintiff has worked, showing that female employees are paid less than men on average. These managers therefore had knowledge of the compensation discrimination present in the stores over which they had authority.

34. Because reasons for compensation decisions are not documented, elements of Wal-Mart's compensation decision-making are not capable of separation for analysis.

35. *Post-2004 Pay Restructuring* — In 2004, Wal-Mart introduced a new pay structure, in which many jobs which had previously been in one pay class were assigned to separate classes depending on department. Pay rates differed depending on the pay class in which an hourly employee worked, and therefore the department in which that hourly employee worked.

36.     The proportion of women in Wal-Mart's departments varied greatly.  Many jobs in departments in which women were over-represented were assigned to lower job classes, while those same job titles in departments over-represented by men were assigned to higher job classes. Wal-Mart's 2004 pay restructuring had an adverse impact on its female employees, including Plaintiff.

37.     In 2005, Wal-Mart started giving newly hired employees "credits" for prior work experience.  Because each credit was worth more to employees in higher job classes, the application of this credit policy exacerbated the pay disparities and had an adverse impact on female employees, including Plaintiff.

38.     Then, in 2006, Wal-Mart added a cap on the pay permitted for each job class, further negatively impacting the pay of women relegated to the lower job classes, which had lower pay caps.  This also had an adverse impact on female employees, including Plaintiff.

**Management Pay**

39.     As with hourly compensation, Wal-Mart issued written guidelines governing management compensation.  These written guidelines applied consistently throughout Regions 9, 20, and 44 and Sam's Club 2 and did not vary by district or store.

40.     In most circumstances, these guidelines prescribed a formula for setting starting pay rates which, because it was largely based on prior pay rates, perpetuated disparities in pay adverse to women.  However, exceptions could be sought, and external hires were not subject to the same formula, and in these instances a single decision maker—the RPM—decided pay.

41.     *Management Trainee Pay* — Starting in 2002, the MIT pay rate for employees promoted internally was set based upon their pay as hourly employees.  Thus, for those promoted

from hourly positions, where women on average had lower hourly pay rates, their pay rates in the MIT program were lower than similarly-situated men, perpetuating the prior pay disparities.

42.     While the pay rates for MIT participants who had been hourly Wal-Mart employees was largely governed by formula, the RPM generally was responsible for setting starting pay rates for external hires for whom no formula controlled.   Higher pay offered to external candidates as compared to internally-promoted MITs provided another opportunity to pay men more than women in the MIT program.

43.     In addition, any discretion permitted in approving exceptions to managerial pay rates, both for internal and external candidates, was exercised by the RPM.

44.     Because the MIT program was for just a few months, there were no pay changes during the MIT program itself, but only upon successful completion and promotion to Assistant Manager.

45.     *Assistant Manager Pay* — When trainees successfully completed the MIT program and became Assistant Managers, their pay was set by formula, initially $2,000 above MIT pay, which itself was directly tied to the hourly pay rate for internal promotes, as described above.

46.     The pay for Assistant Managers who were external hires into the MIT program was also linked to their rate of pay while in the MIT program, but as described above, their MIT pay provided for higher compensation than for internal candidates.  Any exceptions to these formulaic rules required approval of the RPM.

47.     This formulaic use of prior pay rates to set starting Assistant Manager pay meant prior pay disparities adverse to women would be perpetuated.  And the use of exceptions, all ruled on by a single individual RPM, provided the opportunity to create additional disparities adverse to women.

48.     Assistant Managers also received performance evaluations and associated performance pay increases each year, all on the same date.  These were prepared by the Store Manager and District Manager, which were then reviewed and approved by the RVP.  These performance increases were computed as a percentage of the base pay rate, perpetuating prior disparities in pay.  Performance ratings, all approved by the RVP, could incorporate bias and unfairly rate female Assistant Managers lower than their peers.

49.     In addition to performance increases, Assistant Managers could receive merit increases from 2002 to 2006, which had to be approved by the District Manager and RPM.  These merit increases were computed as a percentage of the base pay rate, perpetuating prior disparities in pay.  And they provided an opportunity for these decision makers to exercise bias in choosing whom to favor with these discretionary pay increases.

50.     *Co-Manager Pay* —Co-Manager compensation was comprised of a base salary and profit sharing tied to the profitability of the Co-Manager's store. The RVP determined base salary and assigned the stores at which Co-Managers worked, the profitability of which affects the profit-sharing component of the compensation they receive.  Because some stores are more profitable than others (*i.e.*, better location, fewer nearby competitors), store assignment is a critical component in determining Store Manager Salary.  Women, including Plaintiff, have been assigned to stores that generate lower profits and, as a result, were paid less than their male counterparts.

51.     *Store Manager Pay* — A major part of a Store Manager's compensation is tied to store profitability.  Performance evaluations are not a factor, nor is a Store Manager's ability to execute policies fairly.  The RVP determined and assigned the stores at which Store Managers worked.  Because some stores are more profitable than others (*i.e.*, better location, fewer nearby competitors), store assignment is a critical component in determining Store Manager Salary.

Women, including Plaintiff, have been assigned to stores that generate lower profits, and, as a result, were paid less than their male counterparts.

## PROMOTION DISCRIMINATION

52.    *Management Track Positions Below Assistant Manager* — Support managers are the highest level hourly supervisory positions.  Support managers assume the duties of Assistant Managers in an Assistant Manager's absence. Employees in these positions are often groomed for further advancement. The vast majority of support manager vacancies are not posted or otherwise communicated to hourly associates within the store.  There has been no formal application process for selection for these positions, and no job-related criteria for selecting employees for promotion to support manager.  Additionally, although it is not a true "management" position, department manager is often a necessary step for employees hoping to work their way into salaried management.  Women applying for department manager positions are often subjected to severe gender stereotyping and are rejected out of hand for most openings in arbitrarily-deemed "masculine" departments such as sporting goods, hardware, etc.

53.    *Promotion to Management Trainee* — Entry into the MIT Program is a requirement for advancement into Assistant Manager and other salaried management positions.  Prior to 2003, there was no application process or job posting for MIT positions.  Hourly employees were not provided any information regarding how to enter management, what the requirements or qualifications were for entering management or how to apply for the MIT Program.

54.    Wal-Mart's established criteria for the MIT program prior to 2003 included "willingness to relocate."  "Willingness to relocate" was a factor known to deter women from pursuing such positions and which Wal-Mart executives acknowledged was not justified by business necessity.

55.     In January 2003, Wal-Mart instituted a posting system for entry into the MIT Program.  This system was used through 2006, and positions were posted for one week, a few times per year.  This posting system required candidates to agree to certain job conditions, including: (1) assignment to a store up to a one-hour drive from home; (2) travel for up to six weeks; and (3) replacing the requirement that all candidates be willing to relocate with a statement that the greater geographic area an individual would move to, the more likely they would be promoted.  All three factors would be more likely to discourage women than men, in a manner similar to the prior relocation requirement.  Notably, travel assignments were filled on a voluntary basis, so stating that "six weeks of travel would be required" was not a fair representation of the actual job requirements.

56.     Starting in 2007, Wal-Mart began using a new system for all management promotions, including MIT.  This system permitted employees to register in advance for the positions and geographic areas in which they were interested.  Every vacancy was expected to be posted with a "requisition" which automatically applied the minimum qualifications Wal-Mart required for the position to the group of those who had expressed interest in the position, within that geographic area, and presented the hiring manager with a set of candidates.  It was particularly common for managers to post a position, see who the candidates were and then close the posting without selecting anyone because the manager's pre-chosen candidate was not included in the pool ("pre-selection").

57.     Both before and after Wal-Mart posted MIT positions, the selection process involved screening by District Managers and approval of selections by the RPM.  In 2003, in addition to posting, Wal-Mart adopted standardized interview questions, which it used through 2009.

58.     The District Managers and RPM were provided uniform guidelines setting minimum eligibility criteria for promotion into the MIT Program, including minimum tenure, age (18 years or older), absence of current "active" discipline, satisfactory recent performance evaluations and willingness to relocate.  Yet no job-related criteria have been provided for selecting individuals from the pool of employees who meet these minimum criteria.  Employees selected into the MIT Program are required to transfer from their stores and often from their districts as they enter training and Assistant Manager positions, subject to very limited exceptions that must be approved by the RPM and RVP.

59.     Despite the changes to the MIT promotion process, two things remained as consistent barriers to women: (a) a refusal to post, or a system to circumvent the purpose of posting, to choose a preferred candidate identified prior to posting ("pre-selection"); and (b) requiring candidates to be willing to relocate or to accept comparable conditions on travel and commuting distance.  These policies had a disparate impact on female candidates, including Plaintiff.

60.     Management-track promotional policies and practices have denied interested and qualified women equal access to promotional opportunities because such opportunities are not posted, there is not an open application system, and employees are not informed of the criteria for promotion.  Moreover, managers do not require or use valid, job-related factors in making the promotion selections within the Region.  Nor does Wal-Mart specify the weight that should be accorded any requirements for promotion.  As a consequence, qualified women have been denied equal access to promotions because of their gender.

61.     Managers have not documented, and Wal-Mart has not tracked, the reasons for selecting particular employees for promotion into management.  Managers have not documented,

and Wal-Mart has not tracked, which employees have been denied consideration for promotion because of their inability to comply with these relocation, travel and scheduling requirements.

62.     Wal-Mart's policies, including its failure to require managers to base promotion decisions for individual employees on job-related criteria, its refusal to post job openings and the conditions placed on applicants for the MIT program that they be willing to relocate, have had an adverse impact upon its female employees.

63.     *Promotion to Co-Manager* — The RVP, with input from RPM and District Mangers, selects Co-Managers.  The majority of Co-Manager promotions are transfers across district lines.  Co-Manager openings were rarely posted during the time period applicable to Plaintiffs' claims.  While there have been minimal eligibility requirements for promotion to Co-Manager, such as satisfactory performance and willingness to relocate, there are no job-related criteria for making selections among those who meet the minimum criteria or for determining which store to assign to a Co-Manager.

64.     *Promotion to Store Manager* — Wal-Mart posts openings for most Store Manager positions, but this was not an open-posting system.  Candidates were first required to obtain permission from their District Manager before they were allowed to apply, and District Managers may withhold permission for any reason.  Starting in or about 2006, individuals could register their interest in advance of any positions being posted and without prior approval being required. However, they were required to take and pass an online assessment.  The RVP selects the candidate based upon whatever criteria they choose to apply beyond the corporate minimum guidelines.  This system of subjective decision-making allows managers to implement criteria that may include gender stereotypes.

65.     Female employees in the Districts and Region where Plaintiff has worked have also been far less likely than their male counterparts to receive promotion to management track positions, including support manager, MIT and Assistant Manager, Co-Manager, and Store Manager positions, despite the fact that they have had equal or better qualifications than male counterparts who have been promoted.

66.     Female employees must also wait significantly longer to be promoted into management track positions than men with equal or lesser qualifications.  This is true in each of the Districts and Region where Plaintiff has worked.

67.     Because reasons for promotion decisions are not documented, and Wal-Mart does not create or maintain records that identify the impact of separate components of its promotion policies and practices, its promotion decision-making process is not capable of separation for analysis.

68.     Wal-Mart's management has long known about gender disparities in promotion yet has failed to take appropriate remedial action.  Wal-Mart management thus had knowledge of the promotion discrimination present in the stores over which it had oversight.

69.     Every store, District and Region where the Plaintiff has worked regularly compiles and reports to corporate headquarters the gender composition of its hourly and managerial workforce, employee turnover, exceptions to promotion policies, job posting data, entry into MIT programs and other data.  District Managers, the RPM and the RVP regularly receive these reports.

70.     Wal-Mart's People Division regularly prepares reports for senior management summarizing promotion and incumbency rates for store management positions by gender, and reports are regularly made to the Board of Directors.

71.     District Managers, the RPM and the RVP in the store(s) where Plaintiff has worked regularly visit stores and are aware of the gender composition of the workforce.

72.     Senior management officials, senior People Division officials and outside consultants have warned Wal-Mart that women are not sufficiently represented in management positions, that women are paid less than male employees in the same jobs and that Wal-Mart lags behind its competitors in the promotion of women to management positions.

73.     These officials and consultants have also identified policies and practices at Wal-Mart that have an adverse impact on its female employees, including lack of consistent job posting, the requirement of relocation as a condition of entry into, and promotion through, management, reliance on stereotypes in making pay and promotion decisions, lack of objective criteria for making promotion decisions and lack of consistent and reliable scheduling for management level employees.

74.     Wal-Mart's founder, Sam Walton, conceded in 1992 that Wal-Mart's policies, particularly its relocation requirement, were an unnecessary barrier to female advancement, yet this policy remained in place thereafter.

75.     Senior Wal-Mart managers also blocked policy changes that would have reduced the impact of Wal-Mart's discriminatory policies, including posting of managerial vacancies.

76.     Wal-Mart had never studied or analyzed whether any of its practices were consistent with business necessity or whether less discriminatory alternatives to these policies and practices could be adopted.

**WAL-MART MANAGERS RELY ON DISCRIMINATORY STEREOTYPES**

77.     In the absence of job-related compensation and promotion criteria, Wal-Mart's managers in the store(s) where Plaintiffs have worked, and those supervising the store(s) where

Plaintiffs have worked, rely on discriminatory stereotypes and biased views about women in making pay and promotion decisions.

78.    A 1998 survey of Wal-Mart managers revealed that there was a "good ol' boy philosophy" at Wal-Mart, that many managers were "closed-minded" about diversity in the workplace and that some District Managers "don't seem personally comfortable with women in leadership roles."

79.    The findings of the 1998 survey echoed an earlier 1992 report by a group of female Wal-Mart management employees, who identified a number of concerns for women employees, including the following: "Stereotypes limit the opportunities offered to women," "[c]areer decisions are made for associates based on gender," "[a]ggressive women intimidate men," "men are interviewed as the replacements, women are viewed as support," and "[m]en's informal network overlooks women."

80.    All Wal-Mart Store Managers have been required to attend training programs at the company's Walton Institute.  These managers were advised at the Institute that the reason there are few senior female managers at Wal-Mart is because men were "more aggressive in achieving those levels of responsibility" than women.  Managers were cautioned that efforts to promote women could lead to the selection of less-qualified women over more-qualified men.

81.    On or about January 24, 2004, at a meeting of all Wal-Mart District Managers presided over by Wal-Mart's CEO Thomas Coughlin, the District Managers were told that they were the key to running the stores: "You [the men] are the culture."  The key to success was described as "single focus to get the job done. . . .  Women tend to be better at information processing.  Men are better at focus single objective.  Results driven."  The District Managers were

instructed to create a "culture of execution" and a "culture of results" as they picked "[f]uture leaders [men]."

82.     In deciding which employees to promote as department managers — hourly positions which were often steppingstones into salaried management — Store Managers in the store(s) where Plaintiff has worked would often consider women only for "female" departments, such as health and beauty, jewelry, soft lines and the service desk.

83.     Managers in the store(s) where Plaintiff has worked, and managers who supervised those stores, justified denying promotions to women or paying them less than their male employees because of perceived family obligations of the women and male responsibility to support their families or because of women's presumed inability to relocate.

## WAL-MART'S INEFFECTIVE ANTI-DISCRIMINATION EFFORTS

84.     For many years, Wal-Mart had no meaningful policies or practices to hold managers in, or managers supervising, the store(s) where Plaintiff has worked accountable, financially or otherwise, to ensure equal employment and the implementation of diversity policies and goals.

85.     Starting in 2000, Wal-Mart asked District Managers to set diversity "goals" for advancement of women in management.  The goals were based on each manager's individual views on what was attainable and were not tied to any objective measures of availability or qualifications.  Prior to 2004, failure to meet diversity goals had no financial or other consequence for managers in, or managers supervising, the store(s) where Plaintiff has worked.

86.     As late as 2003, Wal-Mart CEO Coughlin was not aware of any diversity goals or whether managers had met such goals.  Many Store Managers were also unaware of the existence of any diversity goals.

87.     Until at least 2003, there had never been any diversity goals set for individual stores, nor for any compensation practices in the store(s) where Plaintiff has worked.

## ALLEGATIONS OF PLAINTIFF

88.     Plaintiff Patricia Holcomb is a woman who lives in Abilene, Texas. Plaintiff Holcomb was hired by Wal-Mart at Store #966 located in Cortez, Colorado in 1986, and remained employed by Wal-Mart at various stores through May 2004 when she left Wal-Mart's employ while working at Wal-Mart Store #535 in Abilene, Texas.

89.     Plaintiff Holcomb worked primarily as a cashier at Store #966, and she also worked in receiving and stocking at Store #966. She became a Customer Service Manager (CSM) while at Store # 966. When Plaintiff Holcomb worked at Store #966 the Store Managers and Assistant Managers were men.

90.     In 1989 she transferred to Store #1058 located in Montrose, Colorado and worked as a cashier at Store #1058 until approximately July 2001 when she transferred to Store #819 in Coral Gables, Florida. While she worked at Store # 1058, the Store Managers were men and the Assistant Mangers were men except for a few women Assistant Managers who were transferred from other Wal-Mart stores.

91.     While Plaintiff Holcomb worked at Store #1058 she told Store Management that she was interested in being promoted into management, but was never given an interview for any management positions. During these years she worked in Store #1058 there was no application process for becoming an Assistant Manager at Store #1058.

92.     While Plaintiff Holcomb worked at Store #1058 she became a Department Manager in Toys and in the Garden Center, and by 1999 she was again working in the Cash Office because she was being treated poorly by Wal-Mart management when she worked in Toys and the Garden

Center.  No men worked in the Cash Office while Plaintiff Holcomb was working in the Cash Office both prior to and subsequent to her working as a Department Manager in Toys and the Garden Center.

93.     While Plaintiff Holcomb worked at Store #1058 she was told by the men Department Managers what they were paid and she learned that the men Department Managers were paid more than the women Department Managers.

94.     In approximately July 2001 Plaintiff Holcomb transferred to Store #819 in Coral Gables, Florida.  During the time she worked at Store #819 Plaintiff Holcomb's ten-year old daughter was sexually abused by her husband who was criminally charged and later convicted and sent to prison. After Plaintiff Holcomb learned of her daughter's sexual assault she transferred to a store in Midland, Texas in order to extricate herself and her daughter from Florida where her husband was being prosecuted.

95.     When Plaintiff transferred to the Midland, Texas store the only available position was on the overnight shift. Plaintiff Holcomb informed management in the Midland, Texas store she had a daughter who had recently been sexually abused and during her recovery Plaintiff Holcomb would try and work the overnight shift but that she was not confident it would work for her because she needed to be with her daughter during the night. Plaintiff Holcomb tried to make the overnight shift work, but it was too traumatic for her daughter to not have her mother home at night with her, and Plaintiff Holcomb asked Mike McClanahan, Store Manager of the Midland, Texas store to place her on the Day shift. Store Manger McClanahan refused her request and told her she could either work the overnight shift or be terminated.

96.     Plaintiff Holcomb wrote a letter to the Wal-Mart Home Office when the Midland Store Manager refused to let her work days and fired her because she couldn't work nights, and

eventually the Wal-Mart Home Office transferred her to Store # 537 in Odessa, Texas where she could work the day shift.

97.     Plaintiff Holcomb worked as an associate at Store #537 and became a Department Manager, but when she developed pneumonia Wal-Mart told her she had to go on leave without pay or be fired. Plaintiff used her personal leave for three weeks and returned to work, but Wal-Mart only permitted her to work as an associate which was lower pay than her job as a Department Manager. Wal-Mart did not treat men who had to take leave as it treated Plaintiff Holcomb in that men department managers-who went on leave were able to return to their pre-leave position without any loss in pay.

98.     In mid-2003 Plaintiff Holcomb, a single mother with two children, transferred to Store # 535 in Abilene, Texas where she had family who could provide her child care assistance and she could take a job as a night stocker, the only available position at Store #535. While she worked at Store #535 Wal-Mart announced it was implementing a manager in training program and for the first time since she had been working for Wal-Mart, it began posting assistant manager job openings and an application process.

99.     Plaintiff Holcomb, who had 17 years-experience at Wal-Mart, was told by management she didn't have enough experience and gave the assistant manager training position she applied for to a man who had worked at Wal-Mart for many years less than Plaintiff Holcomb and whose experience at Wal-Mart did not encompass the wide scope of Plaintiff Holcomb's Wala-Mart experience. Plaintiff Holcomb was paid less than the man was paid prior to his placement in the MIT program and he was paid an even higher rate of pay than Plaintiff Holcomb when he was placed in the MIT program.

100.    Plaintiff Holcomb continued working at Store #535 for several months after being turned down for the management in training position and her pay continued to be less than men with comparable experience and she was given no other opportunities to apply for management. Plaintiff Holcomb, having experienced lower pay than men and no real promotion opportunities, believed she had no future opportunities for advancement at Wal-Mart and resigned in approximately May 2004.

## CAUSES OF ACTION
### Count I – Violation of Title VII (Disparate Treatment)

101.    All prior paragraphs herein above and below are incorporated as though fully set forth herein.

102.    The foregoing conduct violated Title VII of the Civil Rights Act of 1964.

103.    Wal-Mart violated Title VII by paying Plaintiff less than similarly-qualified or less-qualified male employees and/or by promoting them less quickly and less frequently than similarly-qualified or less-qualified male employees.

104.    Wal-Mart's discriminatory practices described above have denied Plaintiff and other female employees in the store(s) where Plaintiff has worked promotional opportunities and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

105.    The Defendant has perpetrated said discrimination intentionally, willfully, wantonly and/or with reckless disregard for the Plaintiffs' rights and feelings, therefore rendering the Defendants jointly and/or severally liable to the Plaintiff for an additional award of punitive damages.

### Count II – Violation of Title VII (Disparate Impact Discrimination)

106.    All paragraphs herein above and below are incorporated as though fully set forth herein.

107.    Wal-Mart has maintained a system for making decisions about compensation and promotions that has had an adverse impact on its female employees in the store(s) where Plaintiff has worked.  Its compensation policies for setting and adjusting pay collectively and individually, including its failure to require or use job-related criteria for making compensation decisions, have had an adverse impact on women.

108.    Wal-Mart's management track promotion policies — the absence of an open application process and job posting, relocation and travel requirements for management positions, scheduling requirements which deny managers a consistent schedule and Wal-Mart's failure to apply job-related objective criteria for making management selections, etc. — have all individually and collectively caused this adverse impact on female employees in promotions.

109.    Wal-Mart has failed in the store(s) where Plaintiff has worked to create or maintain the data that would allow analysis of the impact of each of these policies and practices individually. Nor does Wal-Mart specify the weight that should be accorded to each of the requirements for pay and promotion. Wal-Mart's pay and promotion policies and procedures are thus not capable of separation for analysis, and accordingly the entire decision-making process for compensation and promotion decisions may each be analyzed as one employment practice. 42 U.S.C. 2000e-2(k)(1)(B)(i).

110.    Wal-Mart's compensation and promotion policies are not job-related or consistent with business necessity.  Wal-Mart's own consultants and human resources staff have proposed job posting, elimination of relocation requirements, adoption of more consistent and reliable scheduling and the use of more objective criteria for management promotions.  Adopting these

policies would have resulted in less discriminatory impact upon female employees in the Region, while serving Wal-Mart's business needs more effectively than its current practices.

111.    Wal-Mart's discriminatory practices described above have denied Plaintiff, and other female employees in the store(s) where Plaintiff has worked, promotional opportunities and compensation to which they are entitled, which has resulted in the loss of past and future wages and other job benefits.

112.    Plaintiff requests relief as provided in the Prayer for Relief below.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief as follows:

a.    All damages that Plaintiff has sustained as a result of Wal-Mart's conduct, including back pay, front pay, compensatory damages and general and special damages for lost compensation and job benefits that they would have received but for the discriminatory practices of Wal-Mart;

b.    Exemplary and punitive damages in an amount commensurate with Wal-Mart's ability to pay, sufficient to punish Wal-Mart and to deter future misconduct;

c.    A declaratory judgment that the practices complained of in this Complaint are unlawful and violate 42 U.S.C. §§ 2000(e), *et. seq.*, Title VII of the Civil Rights Act of 1964;

d.    Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

e.    Pre-Judgment and Post-Judgment interest, as provided by law; and

f.    Such other and further legal and equitable relief as this Court deems necessary, just and proper.

**JURY DEMAND**

Plaintiff demands a jury trial as to all claims so triable.

Dated:  March 12, 2020

Respectfully submitted,


*/s/ Joseph H. Gillespie*
Joseph Gillespie, Esq.
Gillespie Sanford LLP
4925 Greenville Avenue, Suite 200
Dallas, Texas 7520
TX Bar: 24036636
Ph: 214-800-5112 | Fax: 214-838-0001
Email: joe@gillespiesanford.com
*Attorney for Plaintiffs – Lead Counsel*


*/s/ Merit Bennett*
Merit Bennett, Esq.
The Bennett Law Group
460 St. Michael's Drive, Suite 703
Santa Fe, New Mexico 87505
Ph:505-983-9834 | Fax: 505-983-9836
Email: mb@thebenettlawgroup.com
*Pro Hac Vice* soon to be filed


*/s/ Stephen Tinkler*
Stephen Tinkler, Esq.
The Tinkler Law Firm
414-A Old Taos Highway
Santa Fe, New Mexico 87501
Ph: 505-982-8533 | Fax: 505-986-6698
Email: set@tinklernm.com
*Pro Hac Vice* soon to be filed